**LAKE CARRIERS' ASSOCIATION et al.**

v.

**UNITED STATES of America and Federal Communications Commission,**
Respondents.

No. 19488.

United States Court of Appeals
Sixth Circuit.

April 17 and June 16, 1969.

Scott H. Elder, Cleveland, Ohio, Johnson, Branand & Jaeger, Cleveland, Ohio, of counsel, for petitioners.

D. Biard MacGuineas, Counsel, Federal Communications Commission, Washington, D. C., Henry Geller, General Counsel, John H. Conlin, Associate General Counsel, Leonard E. Ehrig, Counsel, Federal Communications Commission, Washington, D. C., for respondents.

Before PHILLIPS, EDWARDS and PECK, Circuit Judges.

ORDER

Oral arguments were heard by this Court on Tuesday, April 15, 1969, beginning at 2 p. m. upon the application of petitioners for an interlocutory injunction restraining or suspending the enforcement, operation or execution of an order of the Federal Communications Commission.

The Court has considered carefully the petition for review and has determined that there is no merit in any of the contentions contained therein which would warrant injunctive relief except those averments bearing upon the public safety. The Court is concerned with the truth or falsity of the allegations of the petition relating to safety and particularly the following averments contained in paragraph 12:

"[P]etitioners will suffer irreparable loss and damage as a result of being denied effective, efficient communications with Canada and other foreign flag vessels; that the safety of navigation on the Great Lakes will be seriously jeopardized through degradation of radio communications; that the vessels of petitioners and their crews will be unnecessarily exposed to increased hazards of collision and injury; that unless the carrier deviation reduction from ± 15 kc/s to ± 5 kc/s is coordinated with Canada and other foreign nations whose vessels utilize the Great Lakes, as contemplated by the World Administrative Radio Conference, Geneva, 1967, navigational safety on the Great Lakes will be seriously impaired, exposing persons and property to unnecessary risks, hazards and dangers; * * *."

It appears that the Commission has not conducted an evidentiary hearing on the request of Lake Carriers' Association for a waiver of the rules requiring modification in the operation of VHF equipment on the Great Lakes on and after March 1, 1969. There is no evidence before this Court upon which a determination can be made as to the truth or falsity of the averments of the petition relating to safety, excepting the affidavit of John J. Renner (Exhibit V to petition for review). This Court therefore determines that, although a hearing is not required by law, a genuine issue of material fact is presented, necessary to a determination of petitioners' application for a stay order or in-

terlocutory injunction. 28 U.S.C. § 2347(b).

It is ordered that, pursuant to 28 U.S.C. § 2347(b) (3), the proceeding is transferred to the Honorable William K. Thomas, United States District Judge for the Northern District of Ohio, for the purpose of hearing evidence and making findings of fact as to the averments of the petition concerning public safety.

Counsel for both parties are directed to prepare and file with the District Judge stipulations of fact as to all pertinent issues upon which an agreement can be reached, for the purpose of expediting the evidentiary hearing.

Upon the completion of the hearing in the District Court, the District Judge will transmit to the clerk of this Court a transcript of the evidence, his findings of fact thereon and the entire record of the proceedings before him. The application of petitioners for a stay order or injunction is taken under advisement pending further orders of this Court.

The costs of the hearing before the District Judge will be advanced by petitioners, pending further adjudication of costs by this Court.

## ORDER

Under date of April 17, 1969, this Court entered an order transferring this case to the Honorable William K. Thomas, United States District Judge for the Northern District of Ohio, for the purpose of hearing evidence and making findings of fact, pursuant to 28 U.S.C. § 2347(b) (3).

District Judge Thomas conducted a thorough evidentiary hearing and filed comprehensive findings of fact and conclusions, which are made Appendix A to this order. Judge Thomas found that the Federal Communications Commission did not act arbitrarily in ordering a frequency deviation reduction on March 1, 1969, on all VHF(FM) transmitters on vessels subject to its jurisdiction and that the safety of navigation on the

Great Lakes has not been jeopardized by such frequency deviation reduction.

Petitioners now have filed a motion to dismiss their petition to review the decision of the Commission and their application for interlocutory injunction. It was stipulated by the parties in the District Court that in view of the factual inquiry in that Court, the hearings held by said Court may constitute and be treated by the Court of Appeals as a hearing on the merits as to the facts and issues involved.

Upon consideration, it is ordered that the petition for review and application for interlocutory injunction be and hereby are dismissed with prejudice, without costs to either party, a public question being involved.

This Court expresses appreciation to District Judge Thomas for the thorough hearing conducted by him and for his findings of fact and conclusions, which have been of great aid to this Court and to the parties in the disposition of this proceeding.

## APPENDIX A

## FINDINGS OF FACT AND COURT'S CONCLUSIONS

THOMAS, District Judge.

Pursuant to its Report and Order in Docket #17295, released July 25, 1968, the Federal Communications Commission (FCC) has amended Parts 2, 81, and 83 of its rules pertaining to the maritime mobile service bands 156–162 Mc/s, VHF(FM) radiotelephony to provide principally for reduction of channel spacing from 50 kc/s to 25 kc/s. A concomitant of the channel spacing is new rule, 47 CFR § 83.137, that, in its footnote, specifies that in transmitters "after March 1, 1969, a deviation of $\pm$ 5 kc/s shall be employed." This replaces the preexisting deviation of $\pm$ 15 kc/s. Docket #17295 was commenced on March 20, 1967, when the FCC issued its notice of proposed rule making.

Whenever frequency deviation is expressed, $\pm$ signs before the kc/s will be

understood even though not inserted. To save endless repetition they will not always be given in the text of these findings. Also, it should be understood that kc/s stands for kilocycles (1,000 cycles) per second and Mc/s stands for Megacycles (1 million cycles) per second. Should the /s be omitted following kc or Mc, nevertheless, these wave cycle initials always mean per second.

The FCC allocates portions of the radio spectrum for numerous uses which contribute to the safety of navigation on the Great Lakes. Among these are (a) radar, (b) radio direction finder, (c) two-way voice communication on frequencies in the 2 Mc band (medium frequency), in the maritime service, (d) two-way voice communication on the 4 and 8 Mc bands (high frequency) in the maritime service, and (e) two-way voice communication on frequencies in the VHF (156–162 Mc bands) in the maritime mobile services.

Lake Carriers' Association (sometimes LCA) and its 22 member companies own or operate 206 vessels that account for more than 98% of the total trip carrying capacity of the United States Great Lakes commercial fleet. LCA and 12 of these companies sue the FCC in the United States Court of Appeals for the Sixth Circuit for a review and determination of the

> validity of the order of March 12, 1969 wherein the Federal Communications Commission, in effect, refused to stay its order of July 25, 1968.

LCA filed its court action following FCC's denial on March 12, 1969, of the LCA's request of February 10, 1969, for a waiver

> of those Rules which would require operation of VHF transmitters with a 5 kc deviation rather than a 15 kc carrier deviation.

Pending review petitioners ask that the Court of Appeals

> enter an interlocutory injunction staying the Federal Communications Commission from requiring, with respect to American flag vessels operating on

the Great Lakes, that the frequency deviation on VHF radiotelephone channels be reduced from ± 15 kc/s to ± 5 kc/s after March 1, 1969. * * *

Petitioners allege that they will

> suffer irreparable loss and damage as a result of being denied effective, efficient communications with Canada and other foreign flag vessels; that the safety of navigation on the Great Lakes will be seriously jeopardized through degradation of radio communications; that the vessels of petitioners and their crews will be unnecessarily exposed to increased hazards of collision and injury; that unless the carrier deviation reduction from ± 15 kc/s to ± 5 kc/s is coordinated with Canada and other foreign nations whose vessels utilize the Great Lakes, as contemplated by the World Administrative Radio Conference, Geneva, 1967, navigational safety on the Great Lakes will be seriously impaired, exposing persons and property to unnecessary risks, hazards and dangers. * * *

On April 15, 1969, during oral arguments upon petitioners' request for an interlocutory injunction the Court of Appeals transferred the proceedings to the District Court of the United States for the Northern District of Ohio, Eastern Division for hearing as to the issues of material fact presented. The transfer was made pursuant to paragraph (b) of Section 2347 of Title 28, U.S.C.

The Court of Appeals has directed this court to hear evidence and make "findings of fact as to the averments of the petition concerning public safety." Upon completion of the hearing this court is directed to transmit to the Court of Appeals "a transcript of the evidence, his findings of fact thereon and the entire record of the proceedings before him."

Petitioners' averments "concerning public safety" have marked the outer boundaries of this court's inquiry. The

complaint and its attached exhibits and the FCC opposition have been treated as part of the record. Oral testimony of witnesses and physical exhibits have been received. Counsel and the court have listened to test tape recordings and a tape of vessel transmissions received at U. S. Coast Guard Soo Control. Counsel and the court have examined the wheelhouse and radio telephone equipment of the SS Georgian Bay, a Canadian vessel, and the radio telephone equipment of the U. S. Coast Guard Cutter Kaw. Counsel and court also heard transmissions and observed the taping of a tape recording by Coast Guard personnel involving the Kaw and the Steamer Henry G. Dalton. All tapes are in evidence. Finally, proposed findings of fact and closing oral arguments of counsel have been considered.

In view of the extent of the factual inquiry, the parties agree that the hearing held by this court may constitute and be treated by the court of appeals as a hearing on the merits, as to the facts and issues involved, even though the transfer of the proceedings to this court arises out of the petitioners' request for an interlocutory injunction.

Out of the factual inquiry certain controlling questions emerge. These are progressively listed and facts are found in connection with each question. The first question that will be considered may be stated:

I. *What is the meaning and import of the reduced frequency deviation?*

Since March 1, 1969, with respect to VHF(FM) transmitters in the 156–162 Mc bands on American vessels (both merchant and government) and in American coast radio stations (commercial and government) the frequency deviation (modulation limit) of the carrier waves has been reduced from ± 15 kc/s (wide band) to ± 5 kc/s (narrow band). In contrast, the existing wide band frequency deviation of the carrier waves of VHF(FM) transmitters on vessels of Canadian and foreign registry

and in Canadian coast stations have not been modified.

Very high frequency (VHF) is the frequency range of radio waves from 30 to 300 Megacycles (Mc/s). VHF modulates the frequency of the radio carrier waves (FM).

FM radio is a method of transmission by which the instantaneous frequency of the radio carrier wave is caused to vary in accordance with the modulating signal. This modulating signal may be music or speech or other sounds. The degree of variation, or the amount of variation, of the instantaneous frequency from the initial or carrier wave frequency is called frequency deviation.

By way of contrast medium frequency (MF) designates the frequency bands from 300 kc to 3 Mc, and high frequency (HF) designates frequencies from 3 Mc to 30 Mc. MF and HF employ amplitude modulation (AM). In AM radio transmission the amplitude of the radio carrier wave is caused to vary in accordance with the modulating signal (sound).

The difference in deviation between 15 kc (wide band) transmitters and 5 kc (narrow band) transmitters causes a power ratio between the former and the latter that is computed to be 9.13 to 1. By definition a decibel is a unit for expressing a power ratio that is equal to 10 times the common logarithm of the power ratio. The common logarithm of 9.13 is .96047. Ten times this common logarithm produces 9.6 as the decibel difference between the two signals.

However, this 9.6 decibel difference does not mean that the voice signal received from the wide band transmitter is 9.6 or 9.13 times as loud as the voice signal received from the narrow band transmitter.

Rather, it means that if a VHF receiver is set for 15 kc and receives a voice signal from a transmitter set at 15 kc, that voice signal will be 9.6 decibels louder than an identical voice signal received under identical conditions transmitted under identical conditions by

a transmitter set for 5 kc frequency deviation.

Julian T. Dixon, Assistant Chief Engineer of FCC, explained decibels as follows. The peak volume of loudness of the sound of a trombone is 10 decibels louder than the peak volume of loudness of a piano. But this does not mean that a trombone is 10 times louder than a piano. Several other facts about decibels help to explain this measuring unit. One decibel is the amount by which the pressure of a pure sine wave of sound change must be varied in order for the change to be detected by the average human ear. The 1 to 3 decibel step is generally regarded as the smallest change in volume of ordinary speech or music type transmissions which can be noticed by the human ear. Thus, 9 decibels represent three fairly discernible steps in speech level.

A quiet whisper heard from a distance of about 5 feet is about 17 decibels above the threshold of audibility. Zero decibels is the threshold of audibility and 110 decibels is the threshold of pain above which sound is felt as a painful sensation and not really heard. The comfortable level of volume would fall somewhere in this wide range, depending on the individual listener and the ambient noise that the listener is exposed to in addition to the signal. Another source (World Book Encylopedia) suggests that "Ordinary speech level is about 65 decibels."

This leads to the next question:

II. *In the main, what is the purpose and point of the FCC Report and Order?*

In 1959 International Telecommunications Union (ITU) gave attention to the world wide need for relieving growing congestion in the use of the 2182 kc safety and distress frequency. Recognizing the necessity to provide, among other things, for an increase in channels in the 156–174 Mc/s maritime mobile services band, the ITU's World Administrative Radio Conference (WARC) in 1967 adopted Multilateral Partial Revision of Radio Regulations (Geneva, 1959) and Final Protocol: Maritime Mobile Service. *Treaties and Other International Acts Series (T.I.A.S.) 6590.* This treaty, with the advice and consent of the United States Senate, was ratified by the President on October 17, 1968. Excerpts from the 1959 and 1967 treaties have been made court exhibits and are received in evidence.

In the United States the same need to provide better radio communication for noncommercial pleasure craft caused the FCC to issue its notice of rule making on March 20, 1967, in Docket #17295. The notice recognized an excess of four million registered craft for noncommercial or pleasure purposes. It was estimated that over 400,000 of these craft may wish to use radio. At that time approximately 125,000 vessels of all classes were licensed by FCC to operate on VHF and/or frequencies at 2 Mc. Approximately 90,000 of these vessels are recreational or pleasure craft involved in noncommercial activities.

Yachts and other power driven pleasure craft ply each of the Great Lakes, and connecting and tributary rivers and waterways. No exact figures for the Great Lakes were made available at the trial. Some estimate can be derived from the 1967 Michigan boat registration that included 25,000 boats exceeding 26 feet and probably the greater percentage are equipped with radio. Of course, this total covers yachts operated on Michigan's many inland lakes as well as on adjacent waters of the Great Lakes.

In the notice of rule making the FCC found that:

the current number of frequencies at VHF and at 2 Mc/s will not accommodate an increase in the number of vessels of this magnitude [400,000].

The notice of rule making proposed the reduction of transmitter frequency deviation from 15 kc to 5 kc.

Conforming to its 1967 notice of rule making the 1968 FCC Report and Order concluded that

the number of frequencies at 2 Mc/s, even after conversion to a single sideband, are and will be insufficient to handle the quantity of communication generated by vessels presently equipped with radio. [par. 5] [Single band as here used relates to AM, not FM transmissions.]

It pointed out that

Further deterioration of this situation is inevitable due to the rapid growth in number of recreational vessels; the number of licensed vessels is increasing at the rate of 1,000 per month. [par. 5]

It added that

Many of these vessels confine their operations to within VHF range of shore and do not require communications over distances as great as that obtainable from 2 Mc/s, under conditions where interference and congestion are not controlling. [par. 5]

The Report and Order establishes 156.80 Mc/s as the VHF calling and safety channel; and this provision is now Section 83.233, effective September 3, 1968.

Following the presidential signature on the Partial Revision are attached several resolutions, including No. MAR 14 that prescribes for channel spacing of 50 kc to 25 kc, and for a maximum deviation of ± 5 kc/s. The FCC Report and Order spaces new channels 25 kc apart within the 156–162 Mc band. Amended Section 83.359 (47 CFR § 83.359) specifies the frequencies available for assignment as result of the channel splitting. The previously designated channels run from channel 6 to channel 38. The new channels run from channel 65 to channel 87. In all, the total available channels in the 156 to 162 Mc/s bands have been increased from 24 to 48.

New rule 83.137 (47 CFR § 83.137), effective September 3, 1968, incorporates the modulation requirements of the FCC Report and Order. Paragraph (b) provides that

Transmitters using F3 emission in the band 156–162 Mc/s shall be capable of proper technical operation with a frequency deviation of ± 5 kc/s,[1] which is defined as 100 percent modulation. In general, transmitters shall be adjusted so that transmission of speech normally produces peak modulation percentages between 75 and 100 percent.

A footnote to this section provides, in part, "After Mar. 1, 1969, a deviation of ± 5 kc/s shall be employed; * * *."

Other parts of the Report and Order which have become amendments to Parts 81 and 83 prescribe radio components and procedures to facilitate channel splitting and frequency deviation modulation. However, these provisions need not be described since they do not directly affect the issues under consideration. The pressing and predictable need to open additional VHF(FM) channels, justifies channel splitting from 50 kc to 25 kc, to double the present 24 VHF(FM) available channels in the 156–162 Mc bands.

An activation of channels of 25 kc width may result in interference in adjacent channels should the existing frequency modulation deviation of 15 kc be continued. Hence, an essential element in activating channels of 25 kc width must be a sufficient reduction in the deviation or variation of the modulation of carrier frequency to contain the radiation of signals within the narrow channel width. It is evident that the frequency modulation deviation of ± 5 kc has a maximum swing of 10 kc which falls well within the width of the split channels, each 25 kc in width. A ± 15 kc deviation would extend beyond, because of its maximum swing of 30 kc/s.

Since it is a legal question, not to be settled here, this court does not undertake to determine whether Resolution No. MAR 14, attached to the Geneva Final Protocol, providing for completion of the transition to a maximum deviation of 5 kc between January 1, 1972 and January 1, 1973, was ratified, as part of the Treaty, by the Senate and the President. Pertinent portions of the

U. S. Treaties (1961 and 1968) have been copied and are forwarded with the record.

Counsel for LCA states that "petitioners do not challenge the sincerity or the motive or objectives of the FCC." He emphasizes that petitioners "believe that yachts and small craft are equally entitled to effective communications and * * * there should be a totally integrated system where the maximum security is provided through radio."

From these references to the small craft noncommercial use of the Great Lakes, principally coast traffic, the interdependent question concerns:

III. *The extent of Great Lakes commerce.*

In the year 1967, the latest year for which figures are available, the Great Lakes commercial fleet of vessels over 1,000 gross tons, included 259 vessels of U. S. registry, having a combined gross tonnage of 2,915,400 tons, and 192 vessels of Canadian registry having a combined gross tonnage of 2,193,800 tons. These ships may be generally classified as bulk freighters, package freighters, and oil tankers. Associated with Great Lakes commerce are car and railroad ferries, dredges, tugs, barges, scows, and some other related vessels.

The Great Lakes commercial fleet is annually augmented by salt water cargo vessels which enter the Great Lakes via the St. Lawrence Seaway bound for ports on the Great Lakes. It is estimated that more than 500 commercial vessels in excess of 1,000 gross tons navigate the Great Lakes at any one time.

The U. S. Coast Guard and the U. S. Army Corps of Engineers, and equivalent Canadian government administrations support and facilitate Great Lakes navigation in various ways. Among its Great Lakes functions, specially built U. S. Coast Guard vessels break ice in the spring; and the Coast Guard carries on search and rescue (SAR) operations. In 1967 there were 7,964 such assistance cases. The Coast Guard broadcasts U. S. Weather Bureau reports, operates beacons, buoys, and other aids to navigation, enforces maritime regulations, and conducts inquiries into the causes of marine disasters. The U. S. Army Corps of Engineers maintains and operates locks, and operates dredges that clear harbors, river channels, and waterways connecting the Great Lakes.

The activity of the Great Lakes commercial fleet is revealed in the 1967 statistics. In a period of 266 days there were 28,462 vessel passages through the canals at Sault Ste. Marie, Michigan and Sault Ste. Marie, Ontario (both upbound and downbound). In 1967 there were a total of 14,815 vessel passages, exclusive of passenger and sand carriers engaged in local trade, through the Detroit River. Of this total 5,935 were Great Lakes vessels, American and Canadian, and 1,109 were ocean vessels, upbound; while 6,032 were Great Lakes vessels, American and Canadian, and 1,109 were ocean vessels, downbound. During the 1967 navigation season there were 7,290 vessel transits of the St. Lawrence Seaway and 7,457 transits of the Welland Canal.

IV. *What is the utility of VHF(FM) radiotelephony to the Great Lakes Commercial Fleet?*

A treaty between the United States and Canada, known as the Great Lakes Agreement, February 21, 1952, [1952] 3 U.S.T. 4926, T.I.A.S. 2666, effective in 1954, requires every vessel of 500 tons and over and certain other categories of vessels to be equipped with AM radio telephones that will operate from the bridge of the ship on 2182 kc, the calling and safety frequency, and on an intership channel, 2003 kc. Each contracting government is also required to ensure listening watches by coast stations on the 2182 kc distress frequency.

A radio speaker must be located in the wheelhouse and kept open to guard the 2182 kc frequency, designated channel 51. Channel 51 permits receipt of calling, safety and distress messages. Frequency 2003 kc, designated channel

52, is used for intership communication after initial contact on channel 51.

In addition, other channels in the 2 Mc band (2003 kc through 2582 kc) are available for intership communication, Coast Guard communications, and public correspondence (ship to ship and ship to shore). Channels in the 4 and 8 Mc band, though devoted to public correspondence in the maritime mobile services, are not presently involved.

Beginning about 1951 commercial vessels on the Great Lakes introduced VHF(FM) radio telephones, developed for the armed services in World War II and improved in the postwar years. The LCA and Great Lakes commercial vessel owners petitioned FCC and secured approval for the establishment of VHF(FM) channels. Channel 16 (156.8 Mc) has evolved as the calling and safety channel. Recently, the 1967 WARC Revised Radio Regulations make 156.8 Mc an international calling and safety frequency.

The Great Lakes maritime mobile channels in use in the VHF(FM) bands 156–162 Mc, spaced not closer than 50 kc apart, are listed in the following table:

| Channel | Ship | Shore | Function |
| --- | --- | --- | --- |
| 6 | 156.3 | 156.3 | Intership (Primary) |
| 7A | 156.35 | 156.35 | Intership and Limited Coast |
| 8 | 156.4 | 156.4 | Intership (Secondary) |
| 10 | 156.5 | 156.5 | Business and Operational |
| 12 | 156.6 | 156.6 | Coast Guard and U. S. Locks |
| 13 | 156.65 | 156.65 | Port Operations |
| 14 | 156.7 | 156.7 | Coast Guard and Can. Locks |
| 16 | 156.8 | 156.8 | Distress/Safety/Calling |
| 18A | 156.9 | 156.9 | Business and Operational |
| 26 | 157.3 | 157.3 | Public Correspondence |
| 28 | 157.4 | 162.0 | Public Correspondence |

Under American law VHF(FM) radiotelephony is not required on American vessels, except for ships using the St. Lawrence Seaway. St. Lawrence Seaway Regulations, applicable in both Canada and the United States (33 CFR § 401.102–10) require vessels "other than pleasure craft less than 65 feet long" to be equipped with VHF radio telephone equipment in addition to MF equipment. VHF equipment must enable communications of 25 miles. In practice VHF (FM) telephony is now operational on all vessels of the Great Lakes commercial fleet. Foreign vessels entering the Great Lakes are similarly equipped by virtue of the Seaway regulations.

Radio telephones in MF/HF have much greater transmission capabilities than VHF(FM). Radio waves in these frequencies are longer; they can bend and follow the earth's curvature, and they can be deflected by the ionosphere back to the earth. In effect a huge party line, 2182 kc (channel 51), the safety and calling channel, is less effective for short range communications. Moreover, as one ship master put it, "AM is not dependable, and FM is. You can have a severe electric storm and FM can still come through." [R 639] (AM picks up the amplitude modulation of atmospheric static.) However, very high frequency waves, relatively shorter in length, travel substantially in line of sight. Hence, assuming open water and that a ship's antenna is 50′ above water, VHF(FM) is reliably readable up to 20 to 30 miles, but can be heard up to 40 or 50 miles. In areas where land obstructions would restrict line of sight wave motion VHF(FM)'s effective distance is correspondingly limited.

VHF(FM) and AM wall phones are mounted, usually, on the right and left sides of the front window of the wheelhouse (also called the pilot house or bridge). These remote control subsets and separate AM and FM speakers are installed in the wheelhouse and in the chart room. Each wall phone is equipped with a handset like an ordinary telephone. Voice communication is activated by depressing a "push to talk" switch. Push buttons on the VHF(FM) wall phone permit selection of channels 16, 6, 8, 12, 14, 10, 26, or 28. Additional speakers and handsets are usually installed in the captain's quarters and in the chart room if one exists.

VHF(FM) makes security calls between ships (bridge to bridge) and from ship to shore; it contacts docks, locks, and lift bridges; it receives periodic and special weather and hydrographic information; and it permits public correspondence between ships, and between ships and their company offices.

Security calls announce a ship's approach to a harbor, anticipate vessel passings at the confluence of rivers, or at a blind river turn, and at course crossings in the open lakes. Security calls permit ships to indicate their respective positions and intended directions in ample time before the event. As one witness characterized VHF(FM) radio telephone, "normally with the radio telephone we have managed up here in the lakes of talking ourselves out of these situations."

Observance of the Rules of the Road still requires the mate on watch, the captain when on the bridge, and the wheelsman to look and listen at all times. Whistle signals may still announce the ship's movements. Yet, it is evident that close intership communication by signal flag and by flashing light has now been superseded in the Great Lakes commercial fleet by radiotelephonic communication. When visual communication is not possible, at night or in fog, radio telephones are the only means of communication. It is also clear that for short range communication (up to 25 miles) VHF(FM) radio telephones, rather than AM radio telephone, serves as the primary means of intership and ship to shore communication on the Great Lakes. MF(AM) is a dual back-up system to VHF(FM). However, during electrical storms, or in the presence of atmospheric static, VHF(FM) may be the only reliable radiotelephone. Like radar, VHF(FM) has become standard navigating equipment on Great Lakes commercial vessels. VHF(FM) is "a tremendous helpmate to safe navigation," to quote John Manning, superintendent of vessel operations of the Hanna Mining Co.

V. *What has been the effect on VHF (FM) radiotelephonic communications in the 156–162 Mc band produced by narrow banding the American transmitters?*

In accordance with the FCC Report and Order, as incorporated in 47 CFR § 83.137 (previously quoted), on or about March 1, 1969, all VHF(FM) transmitters in the 156–162 Mc band on vessels of U. S. registry and in American shore stations altered the frequency modulation deviation from ± 15 kc/s to ± 5 kc/s.

Effective the same date the Interdepartmental Radio Advisory Commission (IRAC) ordered all radio transmitters under its jurisdiction to likewise alter their frequency modulation deviation. IRAC consists of all government agencies having radio transmitting stations. Among the agencies are U. S. Navy, U. S. Army, U. S. Coast Guard, Maritime Commission, the Department of Interior. These government agencies are not subject to the jurisdiction of the FCC. However, FCC and IRAC coordinate their activities; and agreed on the frequency deviation reduction that was ordered.

On the Great Lakes the IRAC order has narrow-banded the transmitters of all Coast Guard vessels and coast stations. Coast Guard Soo Control narrow-banded its FM transmitter on April 1, 1969;

and its FM receiver was narrow-banded on April 25. The U. S. Army Corps of Engineers is affected by the IRAC order and, though the record is silent, presumably the VHF(FM) transmitter at the American Soo locks, operated by the Corps of Engineers, has been narrow-banded.

Two ships' masters testified concerning the operation of their VHF(FM) radiotelephonic equipment. One was Capt. Victor H. Anderson, master of the Steamer Henry G. Dalton. Explaining the purpose to which he puts his VHF telephone, he stated: "Anything pertaining to the safety of navigation of the ship and other vessels concerned; tugs, bridges, just about practically anything." [R 244]

Concerning the reduction of the frequency deviation from $\pm$ 15 kc/s to $\pm$ 5 kc/s, he said he "didn't know [this] at the time [he] left the dock in Lorain, which was approximately 10 days ago." [R 245]

Asked about the quality of communication during these 10 days he answered,

* * * on a couple of different occasions * * * American fleet vessels do not seem to have the power * * *.

As to Canadian vessels, he stated that coming down the Soo this past trip * * * One was ahead of us, and one was astern; and of course we have our VHF on, and they were blaring in so loud—they were close, but they were blaring in so loud we had to turn it down, and after leaving the Soo locks downbound I inquired [of] the Mate, and I said, "Our FM isn't working."

The master added

Our speaker was still down, and one of our company boats, the Edward S. Kendrick, which was 15 miles astern of us and he was very, very faint, and we turned up the speaker, and through the course of the river we did hear other Canadians blaring.

He further stated that in the Detroit River "on different occasions from Port Huron down to Detroit we had the same instances." [R. 246, 247]

John Manning, superintendent of vessel operations of the Hanna Mining Co., told of reports he had received from Capt. Duncan C. Schubert, master of the Steamer Joseph H. Thompson of the Hanna fleet. The report was that

the Canadian shore stations particularly seem to override the American stations, both ship and shore stations, and that also the Canadian vessels came in louder than the American vessels; and he was concerned about the volume control on the set. [R 41]

Capt. Schubert testified later in the hearing. At the Soo he referred to broadcasts coming from VBB, the Canadian Soo station. He indicated that this station blared out on the FM,

because we have one in the chart room going, and we have one in the front room going, and it is too loud, and you are trying to call the quartermaster and the mate, and it doesn't work. [R 633]

This question was put to him by the court:

Well, to go into this; prior to the changeover, as you described it, to narrow side band, what do you say was the comparative volume of the Soo Control, U. S. Coast Guard, and VBB, previous to the changeover? [R 685]

He answered:

I would say they were compatible and harmonious. They were in harmony with each other. There wasn't any change or adjustment necessary.

Then, speaking of the last trip, he said:

this trip here was unbearable. I ordered the pilothouse to shut the damn thing off because you can't navigate a ship and relay messages and give orders to the wheelsman or the pilot to change the engine speed and have somebody in the background trying to blast everything out of the pilothouse. I can't work that way, so I ordered the thing shut off. We took a chance on AM radio.

On cross-examination he was asked about a portion of his written report to

Mr. Manning, received in evidence. This stated:

VBX [VBB], the Soo locks, Canadian, clobbers Soo U. S. Coast Guard Control, and we listen to Soo Control for weather, congestion hazards, and so forth in the St. Mary's River. [R 687]

He indicated that this condition was not really noticed earlier than trip 4. Trip 4 began and ended at Huron, Ohio, April 21 through April 26, 1969.

Capt. Schubert was asked the "effect of the station at Sarnia when you are trying to listen to Belle Island Coast Guard [at the head of the Detroit River just below Lake St. Clair]." He answered:

Well, most of the time it clobbers them and it just puts them out. In fact, if the VBE station [Sarnia, Ontario, where Lake Huron empties into the St. Clair River] is on at the same time that Port Huron, Michigan, is on, and the man at the St. Clair River is trying to make an announcement, or if the two come on together, the VBE station will drown out the Port Huron Coast Guard station.

He explained these announcements are on the open channel 16.

Lorain Electronics Corporation services the radio telephone equipment (including packaging of equipment made by primary electronic manufacturers) of a majority of the Great Lakes vessels companies. It also operates maritime commercial stations. One of these is Station WAD at Port Washington, Wisconsin (20 miles north of Milwaukee). This station monitors 10 open radio telephone channels. These include "an efficient watch on Channel 16 and on Channel 51 in order to hear any distress traffic or urgent or safety broadcasts." [R 171] The total message traffic in 1968 amounted to 18,327 of which approximately 5,277 were FM calls either sent or received on VHF channels 16, 26, and 28.

In accordance with the FCC Order in Docket #17295 the VHF'(FM) transmitting equipment of Station WAD was narrow-banded on March 1, 1969. Chief Operator Elmer Ash was asked what effect, if any, this change had on his operations. He answered:

Well, the first thing we noticed the Americans didn't have the pep or volume, and the Canadians and the Seaway's, the Seaway boats, as they started drifting into our area, they had the normal volume that we experienced over the previous years. [R 174]

He stated that in monitoring these channels it was noticed that they had to turn up the "gain controls on the receivers * * * our volume controls, so we could hear the American ships particularly, without sticking our ears in the speaker." [R 175]

He was then asked, having turned up the audio gain, what results were experienced when talking to Canadian or foreign ships. He answered:

Well, the Canadian ship called us on 16, or we move it over to 26. Say he called on 16. He would be loud, so he was practically shouting; so we turn down the gain control to understand what he is talking about. You can't understand a signal that is loud. [R 176]

As for the station's transmissions he estimated that "about 50 percent of the time" the captains will ask the station to repeat. [R 183]

Within the body of evidence are various tape recordings. Some of these relate to test communications. The first tape received in evidence was made by technicians in the factory and laboratory of Lorain Electronics Eight tests were made and tape recorded on April 22, 1969. Test #3 was made with the receiver wide banded (13 kc) and the transmitter narrow banded (4.5 kc). The receiver volume was set to a comfortable quiet room level. In Test #4 the receiver was wide banded and the transmitter was wide banded, with a deviation of 13 kc. The receiver volume was set as in Test #3.

The tape recording was played several times in the court room and the com-

munication on Test #3 was clear and readable. Test #4, on the other hand, transmitted a message that was readable but louder than the Test #3 message.

A second tape recording in evidence was prepared under the direction of John Renner, a practicing consulting electronics engineer since 1947. In this capacity he is employed by LCA. His tape records four test communications received by the Tug Missouri, docked at the tug office dock in the Cuyahoga River in Cleveland, from the Steamer Robert Hobson, moored at the C. & P. Dock, less than ½ mile away. In Test A, the Hobson transmitter was set at a frequency deviation of 5 kc and in Test B, it was set at a frequency deviation of 15 kc.

The signal received in Test A was normal and readable. The signal received in Test B was readable but definitely louder.

During the hearing, at the request of the court and with the consent of the parties, a tape recording was made by the U. S. Coast Guard. Pursuant to authority of Admiral Ray, Commandant of the Ninth Coast Guard District, Cleveland, Commander Paul T. Anderson, in charge of District Communications, arranged and supervised the Coast Guard personnel making the test. Pre-agreed communications were transmitted first by the U. S. Coast Guard Cutter Kaw and then by the Steamer Henry G. Dalton at 15 kc and at 5 kc frequency deviations. All transmissions were received at the Coast Guard electronic repair shop at the foot of East Ninth Street in Cleveland. The Kaw was at the Coast Guard mooring 75 yards away, while the Dalton was approximately 2½ miles away docked on the Cuyahoga River.

With reference to each boat the communications transmitted at the wide band (15 kc) deviation were only slightly louder than those transmitted at the narrow band (5 kc) deviation. All signals were readable.

The final test exchanged messages between the two vessels with the transmitter of each set at a frequency modula-tion deviation first at 5 kc and then at 15 kc. Noticeably to all when the deviation was set at 5 kc the voice signal from the Dalton, 2½ miles away, came in strong and readable, while the voice signal received from the Kaw, moored 75 yards from the point of reception, was weak.

During a preliminary visit to the radio room of the Kaw, the adjusting screw on the back of the transmitter which alters the frequency modulation deviation was observed. It was stated that approximately a 30-degree turn of the screw makes the adjustment from 15 kc to 5 kc deviation. Also, in the electronic repair shop the use of a modulation meter in actually calibrating or verifying the deviation change on the Kaw transmitter was observed. The entire process took no longer than five minutes.

Capt. Gordan F. Hempton of the U. S. Coast Guard on the staff of the Commandant, is presently assigned as the Chief of Communications Staff in the Office of Operations at Headquarters, Washington, D. C. Asked whether the Coast Guard had looked into the matter of narrow banding prior to final preparation of the United States' position at the WARC, Capt. Hempton replied:

As I just testified, the Coast Guard, in our country, is responsible for safety in distress, and in this connection we wanted to be assured that such actions would not interfere or handicap us in this, and my predecessor, Captain Dorian, had certain tests made at our Coast Guard Electronic Engineering laboratory in Washington approximately two years ago, and to his satisfaction, and to my satisfaction, these tests showed there was nothing to be concerned about, that this didn't interfere with our distress operations. [R 701]

On April 24, 1969, the annual meeting of the Coast Guard communications officers was held in Cleveland. The meeting was attended by Capt. Hempton and 25 communications officers, some from as far away as Hawaii and Alaska. The meeting was held in conjunction with the meeting of the Radio Technical Commis-

sion for Maritime Services, a government-industry organization to which the LCA belongs. Capt. Hempton stated that

> At the Coast Guard portion of this meeting the first item which I brought up for discussion was the very question of the narrow banding and were we sure there would be no degradation or difficulty in the maritime safety and distress system as a result of this * * *. [R 703]

He pointed out that after March 1, 1969, the Coast Guard radio stations have been converted

> and we had actual live experience working with the narrow banding, and there has been utterly no problems or difficulties known to any of my communications officers anywhere in the Coast Guard, and this included the Great Lakes, of course. [R 703, 704]

Commander Paul T. Anderson was asked whether he had "ever received any complaints regarding change to the new deviation." He answered, "None." [R 512] He was asked:

> You have received no inquiries to the effect of, "Has something changed in VHF," or that the VHF, "isn't as good as it was last year." You have received no complaints or inquiries along that line? [R 513]

He answered, "No; I have not."

Capt. John M. Austin, Commander of the Coast Guard base at Sault Ste. Marie, Michigan and Commander of Group Soo, supervises the Soo Control VHF(FM) and AM radio station. He stated he asked

> my controllers, my enlisted controllers as to how this narrow banding has affected their control of traffic. Has it been better or worse, or just the same, and the reply from all was that they could detect no difference in the transmissions received.

Capt. Austin, in speaking of his enlisted controllers, was referring to the enlisted Coast Guard personnel who guard VHF(FM) channels 16 and 12; and MF(AM) channels 51 and 52 in Soo Control, the Coast Guard radio telephone station in Sault Ste. Marie, Michigan. Soo Control regulates and directs, in time of emergency, vessel traffic from Pt. DeTour (the easternmost tip of the Michigan Upper Peninsula) on Lake Huron to Ile Parisienne in White Fish Bay at the east end of Lake Superior. The buoy marked maritime highways wind through a labyrinth of waterways and islands that are loosely called St. Mary's River, varying from the narrow Rock Cut downbound channel and upbound channel on the west and east sides of Neebish Island to great bulges in the river like Munuscong Lake and Lake Nicolet.

On the Lake Survey Charts in evidence Capt. Austin marked the checkpoints at which Soo Control requires each vessel, by radio telephone, to report its draft and its arrival time. Accompanied by its airline distance from Soo Control (the line of sight travel of short radio waves) each point on the upbound and downbound voyages will be designated. Upbound there are three checkpoints: Pt. DeTour, 44 miles; Everens Point (Lookout Pt. 1), 21 miles; Mission Point (Lookout Pt. 3), 2 miles. Downbound there are five checkpoints: Ile Parisienne, 22 miles; Brush Point (the right angled turn east into the Brush Point Ranges), 10.4 miles; Lookout No. 6 (Old Coast Guard Station), 6.1 miles; Mission Point (Lookout Pt. 3), 2 miles; and Rock Cut (Lookout Pt. 4), 16 miles.

Commander Anderson, on his own initiative, requested the taping of operational traffic communications at Soo Control for a 24-hour period covering portions of April 24 and 25, 1969. The tape does not record Soo Control's side of the messages nor was the tape recorder run continuously. As the procedure was explained, the controller switched on the tape recorder whenever a vessel called Soo Control on VHF(FM) open channel 16. No communications on VHF(FM) channel 12 or on AM channels 51 and 52 are recorded. To prevent a pickup of any voice or noise from the controller room, the lead to the tape recorder was connected directly to the audio input into the control receiver speaker. Thus, the

message heard on the open channel 16 speaker was simultaneously recorded on the tape recorder. Apparently throughout the recording the original volume setting of the receiver speaker was not changed.

During Commander Anderson's appearance he brought a tape recorder to court and played about half of the Soo tape. Subsequently on May 12, 1969, in the operations office of the Coast Guard, using the same tape recorder, the entire tape was played in the presence of counsel for all parties. The court attended the first three hours of this session and returned for its conclusion three hours later, but his law clerk remained throughout. All of the readable messages received on April 24, the first at 1541 hours and the last at 2359, some 47 in all, were individually played and repeated until counsel agreed on the identity of the calling vessel and ascribed a readability rating to the message. The QRK, 5 to 1, scale was employed in which primarily in terms of intelligibility, 5 is excellent, 4 is good, 3 is fair, 2 is poor, and 1 is bad. The pertinent data concerning these 47 messages are logged in a court's exhibit.

Of assistance in dissecting the contents of the Soo tape were Soo Control's radio log, its upbound vessel log and downbound vessel log, requested and received after the appearance of Capt. Austin, Commanding Officer in charge of Soo Control. These logs list all vessels passing Soo Control (through either the American or Canadian locks). The omission of any checkpoint message on VHF(FM) could thereby be reliably verified.

The critical characteristics of these 47 individually analyzed vessel transmissions have been collated for each of the checkpoints. The evaluation of the balance of the tape is in evidence but does not modify the analysis of the 47 messages that were examined.

At checkpoint DeTour, four messages were received and five were missed on VHF(FM). The presence of these messages on the Soo upbound vessel log,

means that Soo probably received them on the simultaneous channel 51 (AM) transmissions from these vessels.

DeTour is 44 airline miles from Soo Control beyond the reliable range of VHF(FM). Hence, it is not surprising that some DeTour VHF(FM) vessel transmissions were not heard by Soo. However, it is significant that all five missed messages involved American vessels. In contrast, three of the four DeTour messages received came from Canadian vessels. The fourth was from an American vessel.

This evidence reflects the greater carrying strength of the wide band Canadian transmissions; and it permits a finding that the narrow banded American transmitters are less effective in the fringe or marginal areas of VHF(FM). It also shows the necessity for AM radio telephone as a backup to FM radio telephone. The reverse is true, too.

At Everens Pt. (Lookout Pt. 1), 21 miles away on the upbound course, four American transmissions were heard, all rated 4 to 5. Similarly, one of those American transmissions, though here included, came from Lime Island, 30 miles from the Soo. Two lookout #1 transmissions from a Canadian and a French vessel were each rated 4 to 5.

Going to Ile Parisienne, first checkpoint for downbound vessels, its distance of 22 miles from the Soo is comparable to Everens Point 21 miles from the Soo. All five Ile Parisienne transmissions were received from American vessels. Four of the five were rated 5 and the fifth was rated 4.

Thus it appears, and it is found, that within the maximum reliable range of VHF(FM), i. e., 20 to 30 miles, the narrow banded American transmitters are readable. Moreover, no VHF(FM) transmissions were missed at these distances.

The checkpoint with the next longest distance is Rock Cut (Lookout #4) on the downbound course. It is 16 miles away and southeast of Soo Control. Of the

nine transmissions, four were American and five were Canadian. No VHF(FM) transmissions were missed. One American was rated 4 to 5, one started at 4 and dropped to 1, and two were rated only 2. One Canadian was rated 5, two were 4 to 5, and one was rated 4.

The comparison of American and Canadian ratings indicates that the Canadian transmissions were generally more readable. Probably this difference is primarily due to the stronger Canadian wide band transmissions. However, despite this difference generally the American transmissions were found to be readable. The American transmission that dropped from 4 to 1 during its broadcast illustrates a recurring condition noted in the various voice signals. A large factor in making a transmission intelligible and readable is the sender's voice articulation and separation of his words. Moreover, the maintenance of uniform volume (decibels) in his speaking voice can be the difference between intelligibility and unintelligibility of a message. Whether the bridge personnel of Great Lakes vessels receive needed training and refresher instruction in radio telephone communications is not disclosed in the evidence.

The next lower distance in Brush Point Ranges, 10.4 miles from Soo Control. Of the five transmissions (none were missed) four American signals were rated 4 or 5; and the only Canadian vessel was rated 3.

Lookout #6 is 6.1 miles away. Five transmissions were received from this checkpoint and none were missed. Four of the five were American and were rated 4 or 5. The single Canadian vessel was rated 4.

Lookout #3 is only 2 miles from Soo Control. Of the eight transmissions four American were rated 4 to 5; one American was rated 3; and three Canadian vessels were rated 4 or 5. At this short distance one might expect that all transmissions might be 5. Whether the existence of some geographical obstruction might explain the inexplicable

does not appear in the record. The mystery is magnified by omission from the VHF(FM) tape of a call from a Canadian vessel and a call from an American vessel, both of which calls are logged at Lookout #3 on the Soo vessel logs. Once more the indispensability of dual VHF(FM) and MF(AM) transmissions, each radio telephone transmitter backing up the other, is demonstrated. Equally established is the necessity of dual guarding of both safety and calling channels, channel 16 (FM) and channel 51 (AM).

After both counsel had completed their oral arguments on May 5, the court initiated a discussion that culminated in an agreement of the parties to have the FCC assign inspectors attached to its Field Engineering Bureau, to go aboard certain vessels to observe and to report conditions as to VHF(FM) communications. The court summarized the agreement in these general terms:

it was agreed that the FCC investigator is to carry out his normal duties in terms of an inspection, and certainly to hear any and all complaints that the skipper or his mates may have with reference to the VHF communications, and to make observations and make notes, and to be prepared to report on just what conditions he finds.

In addition to these vessels, it is hoped that these inspectors might also check out conditions with reference to the shore station at Port Washington, WAD, and any other shore stations that may have—that it may be possible to check; that may have figured in the testimony. [R 827]

John W. Reiser and Roy E. Kolly, FCC electrical engineers, were selected by the Field Engineering Bureau to ride the vessels, make the observations, and also to visit and observe conditions at certain shore stations. Each inspector received a copy of the foregoing general instructions of the court. Also, each inspector received a set of more specific written instructions from his bureau, received in evidence.

Each engineer was issued, took aboard, and operated several pieces of equipment on the two vessels ridden by each inspector.

The first was a CEI-VHF(FM) portable receiver and a clip-on antenna, to be attached, where possible, to the roof of the pilot house. The second was a Motorola Gertsch Model FM 7 Frequency Meter to be used to calibrate the receiver. The third piece of equipment was an oscilloscope to measure the frequency modulation deviation of any transmissions received on the CEI portable receiver. To make such a measurement the oscilloscope is connected to the CEI receiver as it receives the transmission under surveillance.

On May 15 and 16, 1969, John W. Reiser and Roy E. Kolly appeared as court's witnesses. In addition to questioning by the court, counsel exercised full cross-examination. Logs made by each witness are in evidence.

Mr. Reiser testified first. He holds a B.Sc. in Electrical Engineering from the University of Michigan, but he also attended Purdue University. He is a licensed radio amateur and operates on AM and VHF(FM) frequencies. His other qualifications in the field of radio electronics were described. He was appointed as an electrical engineer by the FCC in 1961. Since December 1, 1965, he has been Assistant Engineer in Charge, Buffalo office of the Field Engineering Bureau.

At Huron, Ohio on May 9, Reiser boarded the Steamer Joseph H. Thompson, the testimony of whose master, Capt. Schubert, has previously been quoted. While aboard the Thompson, Reiser set up his equipment in the chart room at the rear of the wheelhouse. Both the chart room and the wheelhouse are equipped with radio telephones and speakers that monitor channels 16 and 51.

The Thompson operated upbound to the Soo. Reiser was on watch while it traveled through congested traffic areas. He stood watch through the Detroit River, Lake St. Clair, and the St. Clair River; and through the St. Mary's River to the Soo. He secured his watch at Port Huron and resumed watch in upper Lake Huron. He disembarked at the Soo on May 10 in the late afternoon.

On the afternoon of May 11, Reiser boarded the Steamer Walter A. Sterling at the Soo and rode it downbound. He stood watch through the St. Mary's River and upper Lake Huron. He resumed watch just north of Port Huron at 0825 and remained on watch until it was secured at 1445 where the Detroit River enters Lake Erie. On the Sterling he set up his equipment in the rear of the pilothouse and conducted his observations as he did on the Thompson.

After disembarking from the Sterling at Buffalo he traveled to Port Washington, Wisconsin. There on May 13 and 14, he observed operations at Station WAD, previously described in these proceedings by Chief Radio Operator Elmer Ash.

Reiser explained that

Because of the lower location of the FCC monitoring antenna on the roof of the ship pilothouse, it was not possible to make measurements on many of the signals heard on the ship's permanent receiver equipment. [R 842]

Nevertheless, as he testified and his log corroborates, Reiser, with his oscilloscope, was still able to make frequency modulation deviation readings of the transmissions of various vessels, Belle Island Coast Guard, Soo Coast Guard, and Canadian shore stations VBE at Sarnia, Ontario and VBB at Canadian Soo. His primary observation on both voyages was that these two Canadian shore stations repeatedly measured excessive modulation. He recorded deviation readings from these Canadian shore transmitters as high as 40 kc/s.

He reported that operators on both vessels complained that these Canadian shore stations would broadcast on channel 16 and interrupt messages then in progress.

It is evident that Reiser found, as Capt. Schubert here emphatically testified, that the Canadian shore stations "clobber" the American stations also transmitting on channel 16. Thus an entry in his log on May 12 at 0718 registered VBE (Sarnia) frequency deviation at 35–40 kc. It noted that the Steamer George Steinbrenner could not be heard.

Reiser's oscilloscope visualized the reason. VBE and VBB have been excessively modulating in the 30 kc to 40 kc range, far in excess of the 15 kc frequency deviation presently required of Canadian VHF(FM) transmitters in the 156–174 Mc/s band.

The FCC, on learning of Reiser's startling findings, notified Canadian authorities. The Canadian authorities have since reported to the FCC that corrective action has been taken. Canadian teltex confirmation of this report is entered in this record. The pertinent portion reads:

WE CONFIRM THAT FREQUENCY DEVIATION ON VHF/FM TRANSMISSIONS FROM OUR SAULT STE MARIE/VBB AND SARNIA/VBE STATIONS WAS CHECKED ON THE EVENING OF MAY 15 1969 AND DOES NOT NOW EXCEED PLUS/MINUS 15 KHZ.

(KHZ, symbols for kilohertz. HZ is a new international abbreviation for cycles per second, to commemorate Heinrich Hertz, the discoverer of electromagnetic waves.)

Reiser heard more foreign vessels than Canadian. This is probably explained by a current strike in the Canadian ore mines. His log entries and his oral testimony confirm that he heard no foreign volume rated "low," and that both Canadian and foreign VHF(FM) volume is louder than American VHF(FM). Nevertheless, he did not observe any ship operator having difficulty in receiving FM messages. His Thompson log notes "Did not observe operators adjusting FM volume controls on speakers." He noted, too, that "Mates usually use handphone set to listen to advisory or weather

messages not speaker." Moreover, he stated that he did not observe any "gross differences in loudness on FM channels except VBB and VBE."

Reiser discovered that U. S. Coast Guard Stations, particularly at Belle Island in the Detroit River, are modulating below the prescribed 5 kc. In part, this may be due to a condition noted: "Considerable difference in Detroit Coast Guard operator's speaking of messages." This finding corroborates an earlier reported observation that the manner and uniformity of the speaking voice of the communicator clearly affects message intelligibility; and likewise, whether a message is readable. Whatever the cause the Coast Guard should make needed corrections. Less than $\pm$ 5 kc/s frequency deviation accentuates any contrast in volume of VHF(FM) transmission.

At Port Washington, WAD, a single operator is required to monitor seven AM speakers and three FM channels 16, 26, and 28. Reiser detailed teletypes and other equipment this operator must operate; and listed the sources and volume of traffic. He saw the operators "raise and lower their volume controls" on the receivers "many times." However, he did not hear any repeat requests by these operators except "in the spelling of names of foreign vessels." No missed messages were observed.

Roy E. Kolly followed John W. Reiser to the witness stand, arriving in Cleveland just before he testified. He is a 1965 graduate of the University of Detroit where he received his B.Sc. in Electrical Engineering. Since graduation he has been employed as an engineer in the Detroit office of the Field Engineering Bureau.

Mr. Kolly shipped out from Cleveland on May 10, aboard the Steamer Henry G. Dalton, whose master, Capt. Victor H. Anderson, testified about operation of the Dalton's VHF(FM). On the Dalton he made his observations in the rear of the wheelhouse. His upbound voyage ended at the Soo early on the morning of May 12. On May 13, he boarded the Cason J.

Callaway, a U. S. Steel vessel and one of the newest on the Great Lakes. He disembarked at Gary, Indiana. On May 15, he visited and observed conditions at Detroit Marine-Michigan Bell which operates MF(AM) and VHF(FM) stations, which he designated as WFS. His log notes in part:

Mich. Bell's receivers not narrow banded. Only transmitters * * * Bell has no trouble with receiving ships.

Only on one occasion did the Dalton master complain of the loudness of a Canadian transmission. As to this transmission Kolly noted only a slight difference. Mr. Kolly stated he was able to hear FM transmissions on the Dalton except in three instances. His log reflects 86 transmissions in all.

One missed message involved a transmission between the U. S. Coast Guard and the Westcott (mail boat). The distance of the Westcott was estimated at 20 miles. Mr. Kolly attributed this miss to the Westcott's frequency deviation being about 2.5 kc, producing very little audio signal. He noted the Westcott consistently had less deviation than 5 kc. It should be corrected.

A second missed call occurred when the Dalton's captain switched to channel 6 from open channel 16 in order to hear a conversation between two other ships on channel 6. Kolly continued to hear the call on channel 16.

The third missed call was in the St. Mary's River. Kolly reported that the captain turned down the volume of the open speaker because he could not hear the wheelsman.

On the Cason J. Callaway, Mr. Kolly logged 146 transmissions. One, from the American vessel Armco, had a QRK of 2 (poor). The explanation noted was "Carrier [wave] dropping out." Except for this one message he had no difficulty in hearing any of the radio transmissions. Nor did he receive any complaint from the Callaway personnel about any transmission.

Sincere apprehension was expressed by several witnesses called by LCA that if the receiver volume was turned down due to loudness of a transmission from a wide banded transmitter, that thereafter a transmission from a narrow banded transmitter might not be heard at a time of need.

Engineers Reiser and Kolly both reported that the ships rely heavily on FM, using it much more than AM. Neither reported any serious difficulties with reception of American transmissions, except that caused by excessive modulation of the Canadian shore stations. The discovery of this excessive modulation by skilled and objective FCC engineers has already initiated prompt corrective action. It is urged that FCC, without future legal prodding, should adequately monitor these Canadian shore stations, and any other Great Lakes coast or mobile station, whenever complaints are received of over- or undermodulation, in order to correct interference with effective VHF(FM) communications on the Great Lakes.

The record discloses that for one reason or another, a receiver (FM or AM) volume control may be turned down; or a message may be missed by bridge personnel. With a cutback to 15 kc/s in modulation of the Canadian shore stations the fingered cause of interference with VHF(FM) communication in the Detroit and Soo areas should now be eliminated. Except for the evidence as to VBB and VBE, the evidence does not establish, as petitioners claim, that the intermixture of 15 kc frequency deviation and 5 kc frequency deviation on the Great Lakes has caused messages or is likely to lead to unsafe pilot error in the operation of receiver volume controls.

Nevertheless, it is found that the wide banded transmissions of Canadian and foreign vessels are in fact 9.6 decibels louder than American narrow banded transmissions due to the present intermixture of 15 kc and 5 kc frequency deviation, all transmission and reception conditions otherwise being the same. However, it is found, as Engineer Kolly stated, that the resulting difference in

volume "wasn't enough to make the American stations unreliable or anything." [R 1053]

It is further found that the 9.6 decibel difference in loudness experienced by American vessels, as evidenced in this record, can be minimized, if not eliminated, by alterations in the VHF (FM) receivers.

In its letter of March 12, 1969, denying LCA's request for a waiver, FCC stated:

> With respect to receiver, audio differences, unpleasantness and overload can be corrected by an audio automatic gain control (AGC) amplifier.

Quizzed as to why there had not been exploration of techniques to alter the situation, Mr. Manning of Hanna Mining Co. answered:

> I knew that this case was coming up very soon, and under the circumstances I would say that if there is a necessity for altering equipment or having additional equipment, it depends on the outcome of this case. [R 90]

Based on a somewhat earlier experience with the Lorain Telephone Company, Mr. Herrick, a consulting engineer and operating vice president of Lorain Electronics, questioned the value of an audio automatic volume control. On the other hand, Julian T. Dixon, FCC Assistant Chief Engineer, persuasive in his qualifications and convincing in his testimony, made it clear that if one chose to eliminate the 9.6 decibel difference with a type of automatic volume control he described, "You can approximate to any desired degree of accuracy." Asked about the cost, he stated that in the simplest configuration the components "would consist typically of two diodes, and two or three resistors, and two or three capacitors, and the cost would only be a few dollars * * *." [R 590]

> He added
>
> If desired, the limiter to be added could also include an amplifier stage which would help more precisely to equalize the levels. [R 590]

The cost of this amplifier would be "another few dollars."

Another alteration to reduce or eliminate the 9.6 decibel difference is to narrow band the VHF(FM) receiver.

He itemized the components that would be replaced in the intermediate frequency stage of the receiver to narrow band it. As to cost and time he stated,

> these components would represent a small portion of the total receiver components.
>
> As to time, I believe this could be done rather quickly by service technicians who were equipped for this type of work. [R 607]

Actually the record reveals that narrow banding the VHF(FM) receiver at Soo Control on April 25, took three hours.

Mr. Dixon stated that he "would prefer the narrow band receiver to a wide band receiver with automatic audio volume control, because of other advantage of going to narrow band." He explained:

> The receiver will be less susceptible to interference, and it would be prepared to operate with adjacent split channels in use, and this has to be done anyway; so it seems to me preferable to make the receivers narrow band as soon as possible and get ready for the future. [R 607]

The FCC letter of March 12, 1969, denying the LCA request for a general waiver concludes:

> Should individual licensees have specific difficulties in making the change we would, of course, consider requests for short term waivers.

Mr. Child conceded that although requests for individual waivers would be considered, he didn't say "they would be granted." Nevertheless, the FCC letter permits the reasonable inference that if in undertaking to make any of the corrective alterations to equipment previously enumerated a vessel owner or operator should encounter "special difficulties," it is likely that short term waivers would be granted until the alterations are completed.

It was conceded by FCC witnesses that unless Canadian and foreign vessels similarly alter their receivers the vessels would experience the 9.6 decibel difference in loudness between transmissions caused by an intermixture of frequency deviations. Significantly, however, no Canadian or foreign vessel personnel testified and no evidence was offered to indicate that those vessels are having any difficulty in receiving American transmissions.

On this subject the LCA electronic consultant, John Renner, stated:

By far the better way would be—at this point it would have been better to allow the U. S. vessels, the existing users, to continue to use the 15 KC deviation so long as Canada is continuing in that mode of operation, and foreign vessels coming in through Canada also have been, and we feel that this is essential to maintain our system in the efficiency that it has been, and that it could be continued, at least until such time as some coordinated program to change over with Canada could be arrived at. [R. 288]

He went on to say:

And since the newly derived splits are not going to be assigned in such a way as to note permit continued operation on the existing 50 KC channels on a wide band basis by Canada, and it could be also by us, at least until 1971; we see that nothing is gained at the present time by causing us to reduce our deviation and therefore cause our communications with those whom we have been communicating, and must, the Canadians and the foreign vessels, to be on a degraded basis. [R 288, 289]

Mr. Dan Child, Chief of the Aviation and Marine Division of the Safety and Special Radio Services Bureau of the FCC, testified about eliminating the 50 kc channels.

He was asked: "You can't really do it entirely in the Great Lakes, can you, until such time as the Canadian and foreign vessels reduce their deviation?"

[R 436] He answered: "I can get something immediately * * * maybe only one channel. Perhaps I can't get the second channel until three months from now, depending on how the new equipment comes."

Child stated that the first new split channel will be "the state control channel * * * for the state boating law administrator." He said that "We also hope to break out a new channel for use of small docks and marinas."

LCA counsel then asked him:

Isn't it a matter of balancing the desirability of getting one more channel, or the desirability * * * of limiting this side interference to a degree, against the inconvenience or any problem that might be created insofar as the American flag vessels of communicating with Canadians or foreign vessels?" [R 438]

He answered, "You might limit this to inconvenience. I believe I can agree with you if you limited that to inconvenience caused to your vessels."

He went on to say that the more people he gets "to 5 kc the less will be the difficulty." He stated that

We are getting approximately everyone in the United States. Perhaps as we go to VHF they will come in at 5 KC. This is going rapidly. It could double each year for a while, so we are building quite a system of 5 KC deviation, even in the lakes. The percentage which may not be great today, within a year, by this forceful going ahead, will be considerable number of ships that will be on 5 KC, and this will also cause the Canadians—well, they already are reviewing the situation, but they may wish to come along at a much earlier date, you see. [R 439]

He stressed, too, the factor of not stopping the industry. He testified:

We know that we must move quickly once we decided to make a change as great as this. That is why you found the rules making in the steps we have. We must not stop the industry, for

example, which is what we nearly did. You tell them we are going to a new system and having a new system, and all at once people stop buying the old equipment. * * *. [R 398]

LCA's position, testified to by Mr. Renner and manifested in the searching questioning of Mr. Child by LCA's counsel, Mr. Elder, has a plausible quality. However, the evidence in this record does not warrant a finding that the FCC position, as epitomized in the testimony of Mr. Child, in mandating a 5 kc/s frequency deviation for all American VHF(FM) transmissions is implausible or arbitrary.

By action of IRAC all government radio stations have narrow banded their VHF(FM) transmitters. Judging by the narrow banding of Soo Control's VHF (FM) receiver on April 25, after its transmitter was narrow banded on April 1, 1969, it may be assumed that other government stations are already undertaking the narrow banding of their receivers. Hence, it is manifest that a decreed rollback of the FCC mandated frequency deviation to the prior 15 kc/s will not eliminate intermixture. All government vessels and shore stations operating in the 156–162 Mc/s bands would still be using narrow banded transmitters. This was made clear by Capt. Hempton, USCG. He was asked:

> If FCC rules are rescinded and FCC licensed stations go back to a plus or minus 15 kilocycles per second deviation for transmitters, would that have any effect or requirement on the Coast Guard to take similar action? [R 713]

Capt. Hempton answered:

> Not unless the IRAC order was also rescinded, and I think this is quite unlikely. The government does not share any concern with this. * * * We have spent a great deal of money and time narrow banding, and unless the IRAC order is rescinded, it will not affect us.

## THE COURT'S CONCLUSIONS

In view of, and in accordance with, the facts found by this court, it is concluded:

1. The reduction of the frequency deviation from ±15 kc/s to ± 5 kc/s of VHF(FM) transmitters in the 156–162 Mc/s band has produced a 9.6 decibel difference in loudness of transmissions received from such transmitters, all pertinent conditions being the same; and this decibel difference to some extent has affected VHF(FM) radio communications within the Great Lakes commercial fleet between American flag vessels and Canadian and other foreign flag vessels. However, this decibel difference in transmissions has not caused, or is it likely to cause, messages to be missed in the course of said radio communications.

2. In the course of these proceedings a source of serious interference with reception of VHF(FM) communications by American vessels has been detected and identified; namely, the excessive modulation, i. e., frequency deviation of 30 to 40 kc/s, by Canadian shore stations VBE (Sarnia, Ontario) and VBB (Sault Ste. Marie, Ontario). An official Canadian teltex received by this court, via FCC, reports that the frequency deviation of those stations on May 15, 1969, "does not now exceed plus/minus 15 KHZ [15 kc/s]."

3. The 9.6 decibel difference in loudness of transmissions received from VHF (FM) wide band transmissions, as compared with transmissions from narrow band transmissions, to the extent that it is affecting VHF(FM) radio communications within the Great Lakes commercial fleet can probably be eliminated by feasible alterations that may be made to VHF(FM) receivers. At the very least alterations will diminish any listening difficulty.

4. In view of conclusions 1, 2, and 3 and based upon all of the court's actual findings, the safety of navigation on the Great Lakes has not been "seriously jeopardized" by the effectuation of the FCC frequency deviation reduction on March 1, 1969; nor are the vessels of petitioners and their crews thereby "exposed to increased hazards of collision and injury."